UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

PNC BANK, NATIONAL
ASSOCIATION,

                              Plaintiff,

v.

IRVIN FAMILY LIMITED
PARTNERSHIP, *et al.*

                     Defendants.

Case No. 3:13-CV-00578-JWD-SCR

**ORDER AND RULING ON**
**PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT (Doc. No. 48, 52)**
**AND DEFENDANTS' MOTION TO STRIKE (Doc. No. 62)**

I.      **INTRODUCTION**

       At least seven loan documents, including a promissory note and a multiple indebtedness

mortgage, lie at the heart of three separate, but related, suits.[1] One bank, twice removed from the

---

[1] So as to minimize confusion, this Court will place case numbers only in citation to those filings made in the two non-main case dockets, i.e. 15-cv-00025-JWD-SCR and 14-cv-00766-JWD-SCR. The main case's docket number—13-cv-00578-JWD-SCR—will only be used when the immediately preceding cite referred to another docket.

loan's originator, holding all pursuant to ostensibly valid assignments and demanding their enforcement, appears as the plaintiff in every case. Initially, the title insurer, borrower, and guarantors were the main defendants; they were joined by other purchasers of ill-defined collateral. A mutual mistake infects the mortgage agreement, and title defects abound. On these facts, the Parties seem to concur.

On others, however, they do not.[2] PNC Bank, National Association ("Plaintiff" or "PNC") asks that this Court deem that no genuine dispute of material fact exists regarding the nature of the financial obligations set forth in the Promissory Note ("Note"), most especially the duty of the borrower—Irvin Family Limited Partnership ("Irvin Partnership" or "Borrower")—and the loan's two guarantors—Irvin & Associates, Inc. ("Irvin & Associates"), and Mr. Melvin A. Irvin, Jr. ("Melvin"), his personal duty inherited by his estate upon his death  ("Irvin Succession") (collectively, "Guarantors")—to make full payment in accordance with the Note's plain text. With the Note's import clear, it asks for partial summary judgment pursuant to Federal Rule of Civil Procedure 56.[3] The Guarantors and the Borrower (collectively, "Irvin Defendants") disagree. Consistently, they aver that much uncertainty clouds the Note's legal authority and their own responsibilities due to what they argue are the underlying loan documents' apparent and manifold flaws.

A smaller dispute exists within this larger one. In support of its first motion for partial summary judgment, Plaintiff had included an agreement signed by the Irvin Defendants prior to the Parties' commencement of settlement discussions ("Pre-Negotiation Agreement"). Pointing to this contract's language, PNC requests that this Court consider this contract in its analysis of

---

[2] In this opinion, this Court deals with only two.

[3] In this opinion, any reference to "Rule 56" is to this provision of the Federal Rules of Civil Procedure unless otherwise noted.

the Note's validity. Again, the Irvin Defendants object, arguing that the Pre-Negotiation Agreement embodies the Parties' settlement discussions and is thus inadmissible pursuant to Federal Rule of Evidence 408.[4] For all the ink spilled on this smaller issue, it is the Note's enforceability that is the central issue by Plaintiff's own admission, the Pre-Negotiation Agreement relevant only to the extent it elucidates the former's meaning.

Based on well-settled law, this Court has but one option: to grant Plaintiff's request for partial summary judgment as to the Borrower's and Guarantors' obligations under the Note and deem the additional, albeit inessential, Pre-Negotiation Agreement admissible under Rule 408. In no filing have the Irvin Defendants undermined the four elements necessary for a Note to be accorded legal validity under governing law; with the amount clear and the identities of the borrower, guarantors, and holder not open to reasonable debate, the Irvin Defendants' duties under the Note must be deemed established. True, much doubt may cling to the Plaintiff's ability to enforce the mortgage and cure the title; true, the collateral itself may have been incorrectly described. Nonetheless, the predicates for the Note's prosecution—PNC's status as the holder of the Note, the Borrower's and Guarantors' identities and assent, and the Borrower's default under the Note—cannot be disputed. While the Note compels this conclusion, so that it is unnecessary to weigh the Pre-Negotiation Agreement, this Court also finds this document to be exempt from Rule 408's reach. The reasons are twofold, for it not only predates any such negotiation but also contains an express waiver provision to which the Irvin Defendants freely consented.

Accordingly, as more fully explained below, this Court GRANTS Plaintiff's motions for summary judgment to the extent that Plaintiff seeks a judicial determination of the obligations of the Irvin Defendants under the Note's express terms. Beyond this narrow ruling that the Note is

---

[4] In this opinion, any reference to "Rule 408" is to this provision of the Federal Rules of Evidence unless otherwise noted.

valid and binds the Borrower and Guarantors to pay the full sum owed, this Court does not now

wander. As such, as explained in its conclusion, this Court ORDERS Plaintiff and the

Defendants to submit a joint statement outlining the issues still to be resolved within fourteen

(14) days of this opinion's docketing and by the close of business on the fourteenth day.


## II.    **BACKGROUND**

### A.    **Relevant Facts**

Domiciled in 1056 East Worthey Road, Gonzales, Louisiana, the Irvin Partnership came

into being as a state-recognized partnership on July 31, 1996. At its inception it had two partners:

Irvin & Associates, both a "General Partner" and a "Limited Partner," and Mr. Edgar A. Irvin

("Edgar"), a limited partner only. Also domiciled at 1056 East Worthey Road, Irvin &

Associates had been incorporated on July 18, 1996, and had one director, Melvin, who

simultaneously bore a presidential title. Irvin & Associates would subsequently merge with three

other entities—François Plaza, Inc., on August 6, 1996; Viewpoint Development & Enterprises,

Inc., on January 10, 1997; and Health Plaza, Inc., on January 10, 1997—and emerge as the sole

survivor. In these years, it appears that two natural persons controlled these artificial ones:

Melvin and Edgar, Melvin's son. When the father died in the summer of 2014, Edgar assumed an

additional role: the independent administrator of the Irvin Succession, which had become the

new owner of Melvin's interests in Irvin & Associates and the Irvin Partnership.

On August 29, 2007, a business loan agreement ("Loan Agreement") between the Irvin

Partnership and BMC Capital LLC ("BMC" or "Original Lender"), a Texas corporation, became

effective. (Doc. 1-3, No. 15-cv-00025-JWD-SCR.) The loan's principal totaled $2,550,000, and

its maturity date was set for September 1, 2037. (*Id.*) For the Borrower, Melvin signed. (*Id.* at 7.)

The Loan Agreement named the Guarantors for the loan's full amount: Melvin and Irvin & Associates. (*Id.* at 3, 7.) The Irvin Partnership, again represented by Melvin, and BMC executed the Note on that same day. (Doc. 1-4 at 1, 3, No. 15-cv-00025-JWD-SCR.) Intended to secure the Note, the same persons concurrently signed the Multiple Indebtedness Mortgage ("Mortgage Agreement"), the encumbered property described in an addendum, (Doc. 1-5 at 1, 21, 22–23, No. 15-cv-00025-JWD-SCR), as well as the Assignment of Leases and Rents ("Lease Agreement"), to which a more expansive description of the pertinent lots was attached, (Doc. 1-6 at 1, 14, 16–18, No. 15-cv-00025-JWD-SCR); the Commercial Security Agreement ("Security Agreement"), (Doc. 1-7 at 1, 7, No. 15-cv-00025-JWD-SCR); the Agreement to Provide Insurance ("Insurance Agreement"), (Doc. 1-11 at 1, 2, No. 15-cv-00025-JWD-SCR); and the Hazardous Substances Agreement ("Hazards Agreement" or "Indemnity Agreement"), (Doc. 1-12 at 1, 8, No. 15-cv-00025-JWD-SCR).[5] Already identified as one of the Guarantors in the Loan Agreement, (Doc. 1-3 at 3, No. 15-cv-00025-JWD-SCR), Melvin made this designation official with his signature on the Commercial Guaranty, and with Melvin once more signing, Irvin & Associates did the same on a second such contract (collectively, "Guarantees"), (Doc. 1-14 at 1, 3, Doc. 1-15 at 1, 3, No. 15-cv-00025-JWD-SCR.) These documents—the Loan Agreement; Note; Mortgage, Security, Hazards, and Insurance Agreements; and Guarantees—as well as the two subsequent assignments of these obligations constitute this proceeding's "Loan Documents." (Doc. 13 at 3, No. 15-cv-00025-JWD-SCR.) The Irvin Defendants, which include the Borrower—the Irvin Partnership—and the Guarantors—Irvin & Associates and, with Melvin's death, the Irvin Succession—amount to its principal defendants.

---

[5] While the property subject to the Note and Mortgage and Lease Agreements apparently consists of nine discrete lots, (Doc. 1-2 at 4–6, No. 15-cv-00025-JWD-SCR; Doc. 1-6 at 16–18, No. 15-cv-00025-JWD-SCR), the attachment to the Mortgage Agreement lists only seven, (Doc. 1-5 at 22–23, No. 15-cv-00025-JWD-SCR). This defect is one that PNC hopes to fix eventually.

On the same August day that these sundry agreements were signed by the Borrower, Original Lender, and Guarantors, BMC transferred the Note and Mortgage and Lease Agreements, as well as any related papers and obligations, to Red Mortgage Capital, Inc. (Doc. 1-1 at 1, 2, No. 15-cv-00025-JWD-SCR.) Attached to this assignment was Exhibit "A," which described nine separate lots as the property encompassed by the Mortgage and Lease Agreements. (*Id.* at 1, 4–6, No. 15-cv-00025-JWD-SCR.)  On May 25, 2010, a second assignment was recorded in which PNC became the latest owner of each agreement signed on August 29, 2007, by the Borrower and Guarantors, including the Note.  (Doc. 1-2 at 1, No. 15-cv-00025-JWD-SCR.)[6]

The Note numbers three pages. Its first paragraph reads: "Irvin Family Partnership . . . promises to pay BMC Capital, LP . . . on order, in lawful money of the United States of America, the principal amount . . . together with interest at the rate of 8.020% per annum on the unpaid principal from August 29, 2007, until maturity," (Doc. 1-4 at 1, No. 15-cv-00025-JWD-SCR). The lender's rights under the Note were summarized on its second page: "Upon default," as defined in the preceding section, "Lender may declare the entire indebtedness, including the unpaid principal balance under this Note, all accrued unpaid interest, and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, immediately due, without notice, and than [sic] Borrower will pay that amount." (*Id.* at 2.) As noted above, this right was secured by the Guarantees. (Doc. 1-14, 1-15, No. 15-cv-00025-JWD-SCR). Until maturity and full payment under the Note, the Borrower's "heirs, personal representatives, successors and assigns" would remain bound to

---

[6] Plaintiff also attached the Loan Documents to other filings, including its first post-consolidation motion for summary judgment, (Doc. 48, No. 13-cv-00578-JWD-SCR).

BMC Capital's own "successors and assigns," (*id.* at 3), the latter prerogative reaffirmed in the Loan Agreement, (Doc. 1-3 at 5, No. 15-cv-00025-JWD-SCR).

Beginning on August 1, 2010, the Borrower stopped making the monthly payments of principal and interest required by the Note. (Doc. 1 at 15–16, No. 15-cv-00025-JWD-SCR.) Due to these defaults, PNC "accelerated the maturity of and declared the Indebtedness, which includes, without limitation, the amounts due under the Loan Documents, to be immediately due and payable." (*Id.* at 16, No. 15-cv-00025-JWD-SCR.) PNC so notified the Borrower in a letter dated October 28, 2010. (*Id.*)

Soon after Melvin's death in June 2014, a state court succession proceeding commenced, and the Irvin Succession was born. (Doc. 1 at 11, No. 15-cv-00025-JWD-SCR.) On July 29, 2014, PNC filed a proof of claim. (*Id.*) In his role as the Irvin Succession's representative, however, Edgar "did not acknowledge or reject . . . [its] claim within thirty days of its submission." (*Id.*) Consequently, pursuant to Louisiana law, the claim was rejected, and PNC decided to enforce its claim judicially. (*Id.* (citing to LA. CODE CIV. PROC. ANN. art. 3246)[7].)

### B.    Complaints in Pre-Consolidation Cases

From these facts three separate cases originated.

PNC initiated the first one with a complaint filed on January 4, 2013, naming the Fidelity National Title Insurance Company ("Fidelity") as the lone defendant ("Insurance Action" pre-consolidation, and "Present Action" post-consolidation). (Doc. 1 at 1, No. 13-cv-00578.) Fidelity

---

[7] Under this article, "[a] creditor of a succession may not sue a succession representative to enforce a claim against the succession until the succession representative has rejected the claim," but "[i]f the claim is rejected in whole or in part by the succession representative, the creditor to the extent of the rejection may enforce his claim judicially." LA. CODE CIV. PROC. ANN. art. 3246.

had issued a policy insuring BMC from any loss or damage incurred by reason of "[a]ny defect in or lien or encumbrance on the [t]itle," "[u]nmarketable [t]itle," and "[t]he invalidity or unenforceability of the lien of the Insured Mortgage upon the title" related to the property covered by the Loan Documents subsequently transferred to PNC. (*Id.* at 3.) When the Borrower "defaulted on the Loan in 2010," PNC made a demand for payment and attempted to foreclose on its newly acquired mortgage, thereupon "discover[ing] numerous flaws with the title." (*Id.* at 4–7.) Allegedly, "Fidelity . . . failed and refused, and continues to fail and refuse, to pay the amounts due and owing to PNC Bank to cure the title" despite PNC's persistent requests, and PNC has come to the conclusion "that the title issues are of such magnitude and complexity that Fidelity is obligated to pay off the entire [l]oan amount." (*Id.* at 8.) Accordingly, PNC claimed that Fidelity had breached "its contractual obligation to diligently address PNC Bank's claim" and "its duty of good faith to its insured imposed by the Louisiana Insurance Code," PNC seeking "this Court's enforcement of its rights." (*Id.* at 9.)

Plaintiff docketed a second complaint against other defendants on December 10, 2014 ("Title Action"). (Doc. 1, No. 14-cv-00766-JWD-SCR.) In general, this action originally concerned various title defects in the Mortgage Agreement, as detailed by PNC in the relevant complaint. (*Id.* at 4–6.) The description of the immovable property covered by this contract had been "the Parent Tract, 'less and except' certain tracts previously conveyed to third parties"; "[a]s a consequence, certain 'less and except' tracts were unintentionally omitted from transfers to and from the borrower causing third parties to obtain ownership to portions of the mortgage collateral." (*Id.* at 7.) These parties became the non-Irvin Defendants in the Title Action as well as this proceeding: Viewpoint Development and Construction Company,[8] Orleans Place

---

[8] The connection between this defendant and the similarly named one that merged with Irvin & Associates on January 10, 1997, is unknown to this Court and irrelevant to this opinion.

Subdivision LLC, Sorrento Lumber Company, and Iberville Bank, terminated as a party on February 25, 2015 (collectively, "Non-Irvin Defendants," and, with Irvin Defendants, "Defendants"). (*Id.* at 7–8, 21–24.) Thus, PNC sought a court determination that the Borrower was the sole owner of the mortgage collateral and ordering the conveyance agreements' reformation, thereby ensuring the collateral is properly described and its exclusive interest acknowledged, and the restatement and amendment of several outstanding condominiums declarations purportedly improper under Louisiana law. (*Id.* at 8, 17, 20.)  An agreement between Plaintiff and the Irvin Defendants ("Pre-Negotiation Agreement") formed the basis of the complaint's final prayer for relief, as Plaintiff contended that this contract obligated these defendants to cooperate with PNC in curing these alleged title defects, their failure to do so triggering its right to demand both damages and specific performance. (*Id.* at 25–26.) Plaintiff's complete series of requests, numbering six, appear in the final two pages of this second proceeding's complaint. (*Id.* at 26–27.)

The latest case commenced on January 21, 2015, naming as defendants the Irvin Defendants ("Default Action"). (Doc. 1 at 1, No. 15-cv-00025-JWD-SCR.) From these parties, Plaintiff sought damages representing the full amounts due under the various Loan Documents. (*Id.* at 19–20.) PNC also prayed for judicial recognition of its status as the holder and owner of the Loan Documents. (*Id.* at 20.) Relatedly, recognition of the validity and enforcement of the obligations created by the Loan Documents and of PNC's right to enforce them against any and all persons, including the Borrower and Guarantors, was requested. (*Id.* at 20–21.) Finally, PNC asked for a writ of sequestration directing the marshal to seize the property encompassed by the reformed instruments. (*Id.* at 21.) In this complaint's concluding paragraphs, Plaintiff itemized its prayers. (*Id.* at 19–22.)

On July 1, 2015, these three cases were consolidated. (Doc. 45, No. 13-cv-00578-JWD-SCR.)

## C.     Dispositive Motions Filed in Pre-Consolidated Cases

Pre-consolidation, Defendants filed two motions to dismiss.

In the Default Action, Defendants argued for either dismissal or a stay pending resolution of the litigation in the main case's pre-consolidated docket. (Doc. 10-1 at 2, No. 15-cv-00025-JWD-SCR.) Very broadly, Defendant characterizes Plaintiff's argument thusly—"Specifically, Plaintiff relies on the PNC Mortgage, the PNC Assignment, the Security Agreement, and 'other Loan Documents' in an attempt to evidence that Irvin granted various security interests in Collateral . . . which now entitle Plaintiff to relief for default"—but deems any such resolution as "premature," as Plaintiff has apparently "concede[d]" that the relevant agreements "may be amended by" subsequent litigation. (*Id.* at 5–6.) In the alternative, Defendant characterized a stay as essential "to serv[ing] the interest of justice and allow the Court to maintain control of its docket for these two related matters." (*Id.* at 7–8.) Again and again, Defendants iterated their one central contention: "The question of the precise property encompassed in the PNC Mortgage, PNC Assignment, Security Agreement, and 'other Loan Documents' must be resolved prior to Plaintiff obtaining the relief it seeks." (*Id.* at 8.) This motion prompted a response, (Doc. 12, No. 15-cv-00025-JWD-SCR), and a reply, (Doc. 19, No. 15-cv-00025-JWD-SCR).

The Title Action also includes a motion to dismiss. (Doc. 26, No. 14-cv-00766-JWD-SCR.) There, Defendants first classify and demarcate Plaintiff's claims: (1) "mutual error under Louisiana Civil Code article 1949"; (2) "breach of contract"; and (3) "breach of warranty of title." (Doc. 26-1 at 1–2.) As to (1) ("mutual mistake"), the Irvin Defendants focus on an

apparent requirement embedded in Louisiana law—"privity with the persons who were actually parties to the contract at issue"—and contended that, since "Plaintiff has not specifically pled that it is in privity to the conveyance instruments formed between Irvin and each of the other various Defendants and third parties," it has not alleged the requisite facts. (*Id.* at 3.) The Irvin Defendants concede that "Plaintiff has properly pled privity with regard to the promissory note." (*Id.*) As to both (2) and (3), Defendants insist that Rule 12(b) has not been met, as Plaintiff's prayer for relief is predicated on "legal conclusions." In particular, while Plaintiff pleads that Defendants breached obligations to cooperate with it in correcting defects, "there apparently has been no legal determination that any title defects exist related to the mortgage collateral." (*Id.* at 4.) As such, "Plaintiff's breach of contract and breach of warranty claims must fail [at present], because the claims rely solely on the legal conclusion that title defects exist in the PNC mortgage." (*Id.*) Beyond these more substantive attacks on the complaint, the Irvin Defendants allege that "certain portions" of the complaint are "vague and ambiguous." (*Id.*) PNC responded with an opposition, (Doc. 31, No. 14-cv-00766-JWD-SCR), and the movants replied, (Doc. 33, No. 14-cv-00766-JWD-SCR).

Meanwhile, on March 27, 2015, Plaintiff filed a motion for partial summary judgment in the Default Action. (Doc. 13, No. 15-cv-00025-JWD-SCR.) In this partial motion, Plaintiff moves for judgment as to the amounts that it is owed (as of January 7, 2015) ($3,694,918.77) under the Note. (Doc. 13 at 2, No. 15-cv-00025-JWD-SCR.) It also seeks that any such judgment not affect its rights, claims, and causes of action against all other individuals and against the Irvin Partnership and its related entities as outlined the complaint and as authorized by the relevant instruments. (*Id.* at 2–3.) In so articulating, Plaintiff maintains that any dispute regarding the mortgaged property "does not inhibit or otherwise affect the Borrower's and Guarantors'

personal liability to PNC for amounts owed under the Loan Documents or prevent PNC from

pursing [sic] a judgment against the Guarantors for the amounts owed by Borrower to PNC

under the Loan Documents." (Doc. 13-2 at 12, No. 15-cv-00025-JWD-SCR.) It thus asserts that

"no genuine issue of fact exists as to the liability of the Irvin Successor and Irvin & Associates

under the Guarantees for the amounts due and owing to PNC under the Loan Documents," for

the the existence of the five essential factual predicates for this conclusions cannot be disputed:

(1) "PNC is the rightful holder"; (2) "[t]he Irvin Family Partnership is the Borrower under the

Note and Loan Documents"; (3) "the Irvin Succession and Irvin & Associates are guarantors of

the Irvin Family Partnership's obligations to PNC under the Note and other Loan Documents";

(4) "[t]he Irvin Family Partnership defaulted through its failure to pay monthly installments

required under the Note"; and (5) "thereafter, PNC exercised its right to accelerate the debt owed

under the Note and other Loan Documents." (*Id.* at 14.) Due to these indisputable facts, "the

Borrower and the Guarantors are all liable . . . for all amounts owed to PNC under the Loan." (*Id.*

at 15.) An opposition, (Doc. 22, No. 15-cv-00025-JWD-SCR), and a supporting reply, (Doc. 23,

No. 15-cv-00025-JWD-SCR), followed.


**D.     Dispositive Motions Filed Post-Consolidation**

*1.     Plaintiff's Two Motions for Partial Summary Judgment*

Plaintiff filed two motions for partial summary judgment in the consolidated case,

portions of each echoing several of its prior motions. In the first, Plaintiff requests summary

judgment as to three substantive issues: (1) the duty of the Irvin Defendants to "deliver clear and

merchantable title to the encumbered property under the warranty title covenants of the PNC

Mortgage"; (2) the Irvin Defendants' duty "to execute any necessary documents to maintain the

effect of the mortgage on the Mortgage Collateral under the PNC Mortgage"; and (3) these persons' equally binding obligation "to execute necessary title curative documents under the Pre-Negotiation Agreement," included as Document Number 48-2 and already filed as Document Number 1-13 in Case Number 15-cv-00025-JWD-SCR. (Doc. 48 at 2, No. 13-cv-00578-JWD-SCR; *see also* Doc. 48-3 at 10.) Plaintiff further asks that any such judgment allow it to reserve all rights, claims, and causes of action against all individual persons and entities, echoing its first motion for summary judgment, (Doc. 13, No. 15-cv-00025-JWD-SCR). (Doc. 48 at 2–3, No. 13-cv-00578-JWD-SCR.) The supporting memorandum argues these points in more detail, citing to the Loan Documents. (Doc. 48-3 at 6, 8–9, 10.)

Plaintiff's second motion for summary judgment expands upon the one already filed in the pre-consolidated case, (Doc. 13, No. 15-cv-00025-JWD-SCR). Thus, it again asks for this Court to establish the amounts owed to PNC, (*Compare id.* at 2, *with* Doc. 52 at 2–3, No. 13-cv-00576-JWD-SCR), but adds two new prayers: (1) a declaration that the Defendants "shall be liable . . . for all amounts due and owing under the Note and Loan Documents," and (2) another allowing Plaintiff to reserve the rights "to seek recognition of the PNC Mortgage, the PNC Assignment, and the Security Agreement and to enforce PNC's interests in the immoveable and moveable property that serves as collateral for the Loan," (Doc. 52 at 3), Its fourth basis—reserving its rights to move against all defendants—is otherwise identical to ones previously advanced. (*Id.*; *see also* Doc. 48 at 3; Doc. 13 at 2, No. 15-cv-00025-JWD-SCR.) Its fifth request responds to the argument that a continuance is needed so that more discovery could be had that the Irvin Defendants had made in their reply in the Default Action prior to these cases' consolidation. (*Compare* Doc. 52 at 3, No. 13-cv-00578-JWD-SCR, *with* Doc. 22, No. 15-cv-00025-JWD-SCR.) This motion then refers back to Plaintiff's first motion for partial summary

judgment, (Doc. 13, No. 15-cv-00025-JWD-SCR). (Doc. 52-2 at 2, No. 13-cv-00578-JWD-SCR.)

The Irvin Defendants responded with two substantially similar oppositions in which they characterize this case not as one about "whether money is owed" but "whether a breach of contract occurred and whether mutual errors exists in the underlying contract." (Doc. 57 at 2; Doc. 63 at 2.) Thus, the "broader"—and more accurate—question before the Court is "whether PNC Bank has proved a title defect and that monies are owed based on the assertions (not evidence) in the record," questions that must "be answered in the negative because the record has yet to be fortified with evidence." (Doc. 57 at 3; Doc. 63 at 3.) Subsequently, this memorandum criticizes the Plaintiff's use of the Pre-Negotiation Agreement, (Doc. 48-2), which is the subject of a whole separate series of motions. (Doc. 57 at 9; Doc. 63 at 9.) Defendants thereafter return to old arguments: (1) Plaintiff has not shown that it is in privity to any of the relevant conveyances, and (2) PNC has not established the existence of a "mutual error" by means of "undisputed facts." (Doc. 57 at 14; Doc. 63 at 14.)

Plaintiff replied, emphasizing the tapered scope of its first motion for summary judgment, (Doc. 48). In its words, "PNC Bank's Motion for Partial Summary Judgment seeks to establish only that the defendant, Irvin Family Partnership, had a duty to deliver clear and merchantable title to the Mortgages Property, and has a continuing duty to assist the lender in obtaining clear title to the Mortgaged Property pursuant to the express provisions of the Mortgage Contract." (Doc. 64 at 1.) It admits, however, that it is also "seeking a declaration that the Defendants have a continuing duty under the Pre-Negotiation Agreement," (Doc. 48-2), "to execute curative documents, which would resolve the title defects burdening the Mortgage Collateral." (Doc. 64 at 1–2.)

In a second reply, Plaintiff attacks Defendant's omnibus objection to its second motion for summary judgment, (Doc. 57). (Doc. 68 at 1.) The Borrower's liability is this second reply's sole focus, and Plaintiff relies heavily on the language of the Pre-Negotiation Agreement. (*Id.* at 4.) To PNC, the language of the Loan Documents controls—and their every term established the obvious liability of Guarantors and Borrower alike. (*Id.* at 7.) Otherwise, old arguments are repeated—(1) the Title Action has "absolutely no bearing on the enforceability of the Notes and the Guarantees by PNC as against the Borrower's and Guarantors' liability for all amounts owed under the Loan Documents until those amounts are paid in full," and (2) the meaninglessness of further discovery in light of these documents' clarion quality—though Plaintiff also notes the passing of many months since the Irvin Defendants first pled the need for more discovery as a justification.[9] (*Id.* at 5–8.) Later, Plaintiff revised the number apparently due under the Loan Documents. (Doc. 75-1.) As of September 24, 2015, it stood as $3,757,898.15. (Doc. 75 at 2.)

## 2.    *Motion to Strike*

In the midst of this flurry, a new issue arose: as an attachment to its first motion for summary judgment (and, initially unnoticed, as an attachment to an earlier complaint), Plaintiff had included the Pre-Negotiation Agreement, a contract that set forth the parameters for their subsequent negotiation and included several seemingly substantive admissions by the Irvin Defendants.

The Irvin Defendants oppose its filing and its consideration for three reasons. First, they argue its inadmissibility pursuant to Federal Rule of Evidence 408. (Doc. 54 at 1.) Second, it

---

[9] A court may defer considering or denying a motion for summary judgment "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." FED. R. CIV. P. 56(d)(1). By definition, then, the missing facts must be "essential," a requirement not necessarily synonymous with "material."

contains a confidentiality clause which they claim renders it "not subject to disclosure." (*Id.*) Third, the contract itself indicated that it was "non-binding unless a [s]ettlement [a]greement is confected, and no [s]ettlement [a]greement has been executed to date." (*Id.* at 2.) Therefore, "the Pre-Negotiation Agreement is not subject to disclosure, nor is it admissible." (*Id.*) In essence, the Irvin Defendants urge this Court to seal the various documents touching upon or discussing the content of the Pre-Negotiation Agreement, (*id.*), a request renewed at oral argument, (Doc. 77, No. 13-cv-00578-JWD-SCR).

Later, the Irvin Defendants provide more legal support for their inadmissibility argument, citing to two procedural provisions, in a motion to strike the Pre-Negotiation Agreement from the entire record.[10] (Doc. 62.) First, Rule 56(c)(2) states that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2). Second, Rule 408(a)(2) reads: "Evidence of the following is not admissible — on behalf of any party — either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction . .. conduct or a statement made during compromise negotiations about the claim — except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority." FED. R. EVID. 408(a)(2). The Irvin Defendants argue that, as neither rule brooks any exception, as recognized by this circuit's case law, the Pre-Negotiation Agreement must be struck—and cannot be used to support Plaintiff's motions for summary judgment. (Doc. 62 at 2, 3.)  This motion thereupon stresses that this document's own terms evinced its nonbinding character, echoing what the Irvin Defendants had

---

[10] Although the Irvin Defendants initially sought to strike only the latest docketing of the Pre-Negotiation Agreement, (Doc. 48-2), this Court allowed them to amend their request to encompass every prior docketing of this contract. (*See, e.g.*, Doc. 1-13.)

already argued, (Doc. 54). To wit, since it declares that "neither party shall be bound by or rely upon any agreement or any issues until agreement is reached on all issues," the absence of an actual settlement agreement obviates its use. (Doc. 62 at 2.)

Plaintiff attempts to remove the Pre-Negotiations Agreement from the domain of Rule 408 in three ways. First, it argues that Rule 408 forbids "the admissibility of statements made during a compromise negotiation," but the agreement itself is, self-evidently, a signed contract, therefore not "reveal[ing] the content of any settlement discussions between the parties." (Doc. 73 at 3.) Second, the Pre-Negotiation Agreement specifically says that it "shall be admissible as evidence in any such proceeding to evidence the agreements set forth therein," and only deems the discussions made pursuant to its term non-admissible, not its own distinguishable text. (*Id.* at 3–4.)  Third, it expressly states that the Parties "did not intend to be bound '*except for* the preliminary agreements contained in [the Pre-Negotiations Agreement]." (*Id.* at 4 (emphasis in original) (alterations in original).) For these reasons, Plaintiff contends that the Pre-Negotiation Agreement is "in fact binding and admissible as support for PNC's motions for summary judgment to enforce Borrower's and Guarantors' liability for amounts owed under the Loan Documents." (*Id.*)

In a motion nearly identical to its immediately prior filing, Plaintiff insists that the Irvin Defendants are wholly "wrong," quoting the Pre-Negotiation Agreement's express language. (Doc. 74 at 2.) Per the agreement, the Parties agreed to "plan to discuss various courses of action"; "all such discussions, meetings, negotiations and communications whether occurring before or after the effective date shall (i) not be binding . . ." (Doc. 74 at 2–3.) Based on this language, it is "not in and of itself evidence of either a final settlement agreement . . . or of any particular settlement discussions," so that it lies outside Rule 408's prohibition. (*Id.* at 3.)

Second, the Pre-Negotiation Agreement specifically states that it "shall be admissible as evidence in any such proceeding to evidence the agreements set forth therein." (*Id.*) Plaintiff clarified that it appended the Pre-Negotiation Agreement not to establish liability but as evidence that Irvin Defendants agreed to cooperate with its curative efforts, this document intended to do no more than "support the obvious conclusion that the [Irvin D]efendants have an obligation to assist the lender in completing and executing any curative documents that may be necessary to perfect the security." (*Id.* at 4.)

## III.   DISCUSSION

### A.   Standard of Review

A method for "promptly disposing" of meritless actions, FED. R. CIV. P. 56 advisory committee's note (1937), Rule 56(a) permits a party to "move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought," FED. R. CIV. P. 56(a); *Jones v. State Farm Mut. Auto. Ins. Co.*, 719 F.3d 447, 451 (5th Cir. 2013) (quoting *id.*). A court, in turn, must "grant summary judgment if . . . movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A genuine dispute about a material fact exists when the evidence presented on summary judgment is such that a reasonable jury could find in favor of the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). All facts and evidence must be viewed "in the light most favorable to the non-movant," *Bradley v. Allstate Ins. Co.*, 620 F.3d 509, 516 (5th Cir. 2010); *accord Blow v. City of San Antonio*, 236 F.3d 293, 296 (5th Cir. 2001), while "[t]he party moving for summary judgment bears the burden of identifying the portions of the record that

demonstrate the absence of a genuine issue of material facts," *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009) (citing to *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007)). In reviewing the record, all courts must carefully examine "the pleadings, depositions, answers to interrogatories, and affidavits to determine whether any genuine issue of material fact remains," *Courtney v. Arthur Andersen*, 264 F. App'x 426, 428 (5th Cir. 2008) (citing earlier version of Rule 56(c)). But, under Rule 56, no judge may "weigh evidence or evaluate the credibility of witnesses," *Morris v. Covan World Wide Moving*, 144 F.3d 377, 380 (5th Cir. 1998), for "[d]etermining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact," *Anderson*, 477 U.S. at 255.  Axiomatically, the substantive law applicable to the relevant claim determines a particular fact's potential materiality. *Id.* at 248; *see also, e.g.*, *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) (quoting *id.*). Reflecting the rules' twined emphases on efficiency and justice, Rule 56(a) allows for partial summary judgment. FED. R. CIV. P. 1, 56(a); *Ozee v. Am. Council on Gift Annuities*, 888 F. Supp. 1318, 1321 (N.D. Tex. 1995) ("[A] major benefit of partial summary judgment is to accelerate or to expedite litigation by framing and narrowing the triable issues." (internal quotation marks omitted)).

Not infrequently, contract interpretation is a question of law, *see, e.g.*, *UPI Semiconductor Corp. v. Int'l Trade Comm'n*, 767 F.3d 1372, 1377 (Fed. Cir. 2014), making it an issue well-suited to partial adjudication under Rule 56, *see* FEDERAL JUDICIAL CENTER, THE ANALYSIS AND DECISION OF SUMMARY JUDGMENT MOTIONS 28–29 (1991). As a result, the ambiguity or the clarity of a particular contract's language has often been resolved by courts pursuant to Rule 56. *See United Ass'n Local 38 Pension Trust Fund v. Aetna Cas. & Sur. Co.*, 790 F.2d 1428, 1430 (9th Cir. 1986) (observing that "[i]f the interpretation of the language of the

contract were the sole issue, the court might be able to resolve the matter on summary judgment

for only questions of law would be in controversy"). Even contractual ambiguity will not defeat

summary judgment so long as "there is relevant extrinsic evidence . . . [that] creates no genuine

issue of material fact and permits interpretation of the agreement as a matter of law." *Shepley v.*

*New Coleman Holdings Inc.*, 174 F.3d 65, 72 n.5 (2d Cir. 1999) (quoting *Nycal Corp. v. Inoco*

*PLC*, 988 F. Supp. 296, 299 (S.D.N.Y. 1999)). As with statutes, *see, e.g.*, *Stern v. Am. Home*

*Mortg. Servicing, Inc. (In re Asher)*, 488 B.R. 58, 64 (Bankr. E.D.N.Y. 2013) ("Ambiguity only

exists so long as several plausible interpretations of the same statutory text, specific and different

in substance, can be advanced."); *see also* Amir Shachmurove, *Sherlock's Admonition:*

*Vindicatory Contempts as Criminal Actions for Purposes of Bankruptcy Code § 362*, 13 DEPAUL

BUS. & COM. L.J. 67, 74–75 (2014) (explaining how to ascertain a statute's degree of ambiguity

pursuant to well-established principles of statutory interpretation); *cf.* Amir Shachmurove,

*Purchasing Claims and Changing Votes: Establishing Cause under Rule 3018(a)*, 89 AM.

BANKR. L.J. 511, 528–31 (2015) (extending this theory to federal rules), a contractual term is

"ambiguous if it is susceptible to 'more than one meaning when viewed objectively by a

reasonably intelligent person who has examined the context of the entire integrated agreement

and who is cognizant of the customs, practices, usages and terminology as generally understood

in the particular trade or business,'" *Bloom v. Hearst Entm't*, 33 F.3d 518, 522 (5th Cir. 1994),

and "not . . . simply because the parties disagree upon the correct interpretation," *Olin v.*

*Tidewater, Inc.*, 897 F. Supp. 968, 971 (N.D. Tex. 1995). The existence of such true ambiguity

over a material term creates a jury question, for "the meaning of an ambiguous provision is

[traditionally] a question of fact." *Jang v. Boston Scientific Scimend, Inc.*, 729 F.3d 357, 362 (1st

Cir. 2013). In addition, "where the controversy centers not on interpretation of the contract but

on whether the terms of the contract were met the case must be submitted to the trier of fact."
*Aetna*, 790 F.2d at 1430.

**B.     Validity of Note: Texas Law on Promissory Notes**

Based on the Parties' arguments, (Doc. 48, 52), and concessions, (Doc. 63 at 2), in accordance with applicable Texas law,[11] (Doc. 1-4 at 2, No. 15-cv-00025-JWD-SCR), Plaintiff is entitled to summary judgment as to the Irvin Defendants' financial obligations under the Note, including the incorporated guarantee agreements.

Having adopted the Uniform Commercial Code ("UCC"), Texas law defines a promissory note as "an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order." TEX. BUS. & COM. CODE ANN. § 3.104(a); *Amberboy v. Societe de Banque Privee*, 831 S.W.2d 793, 793 (Tex. 1992). To qualify, such a promise must be "payable to bearer or to order at the time it is issued or first comes into possession of a holder," "payable on demand or at a definite time," and "not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money." TEX. BUS. & COM. CODE ANN. § 3.104(a)(3)(A)–(C); *Eoff v. Cent. Mut. Ins. Co.*, 461 S.W.3d 648, 658 n.7 (Tex. App. 2015) (citing *id.*); *accord Am. Bank v. Saxena*, 553 So. 2d 836, 842 (La. 1989) (citing Louisiana equivalent). It may, however, still fall

---

[11] More precisely, the Note is "governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflict of laws provisions." (Doc. 1-4 at 2, No. 15-cv-00025-JWD-SCR.) In such cases, courts apply the named state's variant of the Uniform Commercial Code. *See, e.g.*, *S. Bank & Trust Co. v. Laburnum Hotel Partners LLC*, No. 2:13cv216, 2015 U.S. Dist. LEXIS 68520, at *17 n.6, 2015 WL 3404747, at *11 n.6 (E.D. Va. Apr. 9, 2015); *Am. Home Assur. Co. v. Weaver Aggregate Transp., Inc.*, 84 F. Supp. 3d 1314, 1319 (M.D. Fla. 2014); *Peoples Bank v. Bluewater Cruising LLC*, No. C12-00939RSL, 2014 U.S. Dist. LEXIS 6428, at *13–15, 2014 WL 202105, at *4 (W.D. Wash. Jan. 17, 2014). It is a practice well-established. *See United States v. Fleet Bank (In re Calore Express Co.)*, 288 F.3d 22, 44 (1st Cir. 2002) (explaining why).

within this denotation if it contains "an undertaking or power to give, maintain, or protect collateral to secure payment, . . . an authorization or power to the holder to confess judgment or realize on or dispose of collateral, or . . . a waiver of the benefit of any law intended for the advantage or protection of an obligor." TEX. BUS. & COM. CODE ANN. § 3.104(a)(3)(A)–(C); *Leavings v. Mills*, 175 S.W.3d 301, 310 (Tex. App. 2004). Unless specifically denied in the pleadings, each signature on an instrument is admitted. TEX. BUS. & COM. CODE ANN. § 3.308(a); *cf. JP Morgan Chase Bank, N.A. v. Boolus Boohaker & Bonnie Bivens Boohaker*, 168 So. 3d 421, 426 (La. Ct. App. 2014) (applying same principle as encoded in Louisiana). If so, production of the relevant instrument entitles a holder to recover on it and on summary judgement unless the defendant establishes a defense. TEX. BUS. & COM. CODE ANN. § 3.308(b); *Grosche v. Gabriel*, 824 S.W.2d 607, 610 (Tex. App. 1992). Assuming no such counter has been made, to collect on a promissory note, a plaintiff must establish (1) the existence of the note in question, (2) the defendant signed the note, (3) the plaintiff is the owner and holder of the note,[12] and (4) a certain balance is due and owing on the note. *Edlund v. Bounds*, 842 S.W.2d 719, 724 (Tex. App. 1992); *cf. Johnson v. Drury*, 763 So. 2d 103, 110 (La. Ct. App. 2000) (stating the very similar Louisiana variant). As this schematic suggests, enforcement of a promissory note does not require a perfect mortgage. *Johnson-Williams v. CitiMortgage, Inc.*, No. 3:14-cv-3927-M (BH), 2015 U.S. Dist. LEXIS 110842, at *9–10, 2015 WL 4997811, at *4 (N.D. Tex. July 16, 2015) (collecting Texas law); *cf. Pannagl v. Kelly*, 142 So. 3d 70, 74 (La. Ct. App. 2014) (quoting *Gulf Fed. Savings & Loan Ass'n v. Nugent*, 528 So.2d 782 (La. Ct. App. 1988), for the proposition that summary judgment was appropriate when "factual dispute existed concerning substitution of collateral, but there was no dispute regarding the note and guaranty"). A

---

[12] In detail, the Texas UCC governs the procedures for establishing a particular plaintiff's status as holder. TEX. BUS. & COM. CODE ANN. §§ 3.201, 3.203, 3.204.

foreclosure action may therefore be stymied by a defective title, but "[f]oreclosure is an independent action against the collateral" that "enforces the deed of trust, not the underlying note," *Rearden v. CitiMortgage, Inc.*, No. A-11-CA-420-SS, 2011 U.S. Dist. LEXIS 87567, at *7, 2011 WL 3268307, at *3 (W.D. Tex. July 25, 2011), and "[w]here a debt is secured by a note, which is, in turn, secured by a lien, the lien and the note constitute separate obligations," *Aguero v. Ramirez*, 70 S.W.3d 372, 374 (Tex. App. 2002). Quite simply, pursuant to the governing law of the Lone Star State, only a defense to liability on the note can defeat summary judgement, regardless of the collateral's suspect nature and the relevant mortgage's imprecation. *See, e.g.*, *Jones v. Deutsche Bank Nat'l Trust Co.*, No. 3:12-CV-3929-L, 2013 U.S. Dist. LEXIS 96276, at *23, 2013 WL 3455716, at *8 (N.D. Tex. July 9, 2013) (collecting Texas cases).

Per these legal strictures, with no reasonable doubt about the validity of the Note having been created by the Irvin Defendants' evidentiary submissions, the duties of the Borrower and Guarantors under the Note must be considered established as a matter of law. In this proceeding, the Irvin Defendants have conceded that the obligation embodied in the Note is owed, (Doc. 63 at 2, No. 13-cv-00578-JWD-SCR), and they have not raised a single defense to the Note's validity as to its enforcement, confessing to the signatories' identities and assent by their consistent silence.   Indeed, by their own admission, "this case asked whether a breach of contract occurred and whether mutual errors exist in the *underlying* [mortgage] contract." (*Id.* (emphasis added)) As their filings acknowledged, the mutual error concerns the collateral's description in the Mortgage Agreement, while the alleged title defects may affect Plaintiff's ability to enforce the mortgage. (*See, e.g.*, Doc. 22 at 2, No. 15-cv-00025-JWD-SCR; Doc. 26-1 at 2, No. 14-cv-00766-JWD-SCR.) Even accepting the Irvin Defendants' own characterization, only "the property rights of the Mortgaged Property connected to the Promissory Note" remain

unresolved and disputed; as they concede, the money borrowed, as memorialized in the Note, must still be repaid, with interest assessed and fees tabulated. (Doc. 22 at 2, No. 15-cv-00025-JWD-SCR; Doc. 57 at 2, No. 13-cv-00578-JWD-SCR.) Though these faults may be "connected" to the Note, these defects do not infect the Note proper, and at no single point have Defendants raised questions about the only facts required to support this discrete mandatory obligation's core validity under Texas law: that BMC Capital loaned $2,255,000 to the Irvin Partnership, and both Melvin and Irvin & Associates signed as guarantors. The existing record evidences these facts—and it needed to evince no more for Texas law to be satisfied.  The validity of the mortgage securing the Note may be still be the subject of some debate, requiring discovery and more, but not even the presumed truth of such a supposition can possibly undermine a borrower's and guarantors' obligations under an unambiguous promissory note and any related guarantee agreements. Here, such a note—the Note—exists. As a matter of Texas law, therefore, the debt it has generated must be said to exist as well, as does the Irvin Defendants' status as the fettered Borrower and bound Guarantors under the Note's unadorned language. PNC, whose position as its rightful holder is attested by two undisputable written assignments,[13] has produced the Note. With that task completed, the Irvin Defendants' failure to establish a defense compels one result: partial summary judgment in Plaintiff's favor.

---

[13] The Irvin Defendants consistently raise an argument to the Note's enforcement predicated on PNC's privity with BMC.  Nevertheless, its ownership is documented by two written assignments, more than sufficient to prove its position as holder under Texas law. While "a mortgagor/borrower has standing to challenge the validity of an assignment of the deed of trust and note even if the mortgagor/borrower was not a party to the assignment" under Texas law, *Reinagel v. Deutsche Bank Nat'l Trust Co.*, 722 F.3d 700, 706 (5th Cir. 2013), few formalities must attend an assignment for it to be effective, and the Irvin Defendants have not given the Court a good reason to question the legality of the two assignments attached to Plaintiff's verified complaint, (Doc. 1, No. 15-cv-00025-JWD-SCR).

**C.     Admissibility of Pre-Negotiation Agreement**

Just as surely, the Irvin Defendants have misapplied Rule 408 in their effort to render the Pre-Negotiation Agreement inadmissible. Rule 408 deems as inadmissible evidence "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction" if it exhibits two characteristics. FED. R. EVID. 408(a); *Clarendon Nat'l Ins. Co. v. Nat'l Fire & Marine Ins. Co.*, 512 F. App'x 671, 673 (9th Cir. 2013) (citing rule). First, the evidence itself must relate to "[the] furnishing, promising, or offering — or accepting, promising to accept, or offering to accept — a valuable consideration in compromising or attempting to compromise the claim"; second, subject to an inapposite exception, it must be "conduct or a statement made during compromise negotiations about the claim." FED. R. EVID. 408(a)(1)-(2); *In re MSTG, Inc.*, 675 F.3d 1337, 1343–44 (Fed. Cir. 2012). Assuming these predicates are met, Rule 408 allows for the exclusion of even relevant evidence, and "[w]hile the rule is ordinarily phrased in terms of offers of compromise, it is apparent that a similar attitude must be taken with respect to completed compromises when offered against a party." FED. R. EVID. 408 advisory committee's note. To wit, "the *content* of a settlement agreement" is always inadmissible so as to show a person's liability or a claim's invalidity. *Latiolais v. Cravins*, 574 F. App'x 429, 435 & n.21 (5th 2014) (emphasis in original) (relying on *Branch v. Fid. & Cas. Co.*, 783 F.2d 1289, 1294 (5th Cir. 1986)). Despite the Irvin Defendants' arguments, the Pre-Negotiation Agreement falls outside of Rule 408 for two reasons.

First, like other privileges, it too can be waived. *See, e.g.*, *United States v. Fifer*, 206 F. App'x 502, 509 (6th Cir. 2006). Here, the Pre-Negotiation Agreement, signed by every Irvin Defendant, contains precisely such an explicit waiver clause—"[T]his Agreement shall be admissible in any such proceeding to evidence the agreements set forth therein," (Doc. 48-2 at 2,

9, 10)—one that no Irvin Defendant has denied actually signing. As such, by accepting the Pre-Negotiation Agreement's factual averments—"The principal and interest amounts due by . . . you[, Irvin Defendants,] under the Loan as of April 3, 2011 . . . ."—this Court does no more than accept the Irvin Defendants' own factual representation, any admissibility objections having been rather clearly waived. As the Sixth Circuit explained, albeit in a different context, "absent evidence that a waiver is unknowing or involuntary, defendants may waive . . . [Rule] 408 objections implicitly and explicitly." *United States v. Fifer*, 206 F. App'x 502, 509 (6th Cir. 2006). In light of a single sentence in the Pre-Negotiation Agreement, the Irvin Defendants did.

Second, Rule 408 only applies to statements made during a settlement negotiation. FED. R. EVID. 408(a). By its own terms, it thus does not sweep into its ambit an unambiguous agreement made so as to set forth a framework for parties' prospective negotiation. *Vargas Realty Enters. v. CFA W. 111 St., L.L.C. (In re Vargas Realty Enters.)*, 440 B.R. 224, 242–43 (S.D.N.Y. 2010). While  the substance of the Parties' negotiations are covered, as would any actual settlement agreement, by Rule 408, this written contract, whose drafting and signing predated the commencement of any formal negotiations, cannot be so. *Cf. Cates v. Morgan Portable Bldg. Corp.*, 780 F.2d 683, 691 (7th Cir. 1985) ("[A] settlement agreement is admissible to prove the parties' undertakings in the agreement, should it be argued that a party broke the agreement.") By any reasonable measure, the Pre-Negotiation Agreement only established the Parties' agreed-upon framework for subsequent settlement discussions; more a catalyst than anything else, it was neither the production intermediate nor the byproduct of the negotiations intended to be protected by Rule 408. Its bare text makes this fact clear: having explained its origins—"You have requested that Borrower and Lender conduct discussions and negotiations . . . "—PNC disavowed any intent to enter into such negotiations prior to the Irvin

Defendants' assent to this contract: "We are willing to commence and participate in such [settlement] discussions and negotiations, but only upon execution of, and in accordance with the terms, covenants and conditions contained" in the body of the Pre-Negotiation Agreement itself. (Doc. 48-2 at 1.) This conclusion—that settlement negotiation were to follow the agreement's formalization—is buttressed by the very next paragraph, which outlines the Parties' plans— "Without liability for failing to do so, you and we each plan to discuss various courses of action . . . ."—and identifies those future, as yet unconsummated, discussions as "constitut[ing]" nonbinding "settlement negotiations." (Doc. 48-2 at 1–2.) Even if this reading appears unusually strict, a plain and unambiguous verse demands it, a text this Court must enforce and to which the Irvin Defendants acceded on April 4, 2012. (*Id.* at 1; *see also* Doc. 1-13 at 1, No. 15-cv-00025-JWD-SCR).[14]

## IV.  **CONCLUSION**

On two points, the law and record are indisputable. As written, the Note itself is crystal clear, and the obligations specified therein attested to by the clearest text, with Texas law affording no relief to the Irvin Defendants. Correctly read, Rule 408, in turn, poses no hurdle to the admission and consideration of the Pre-Negotiation Agreement, as the Irvin Defendants waived any such objection and cannot evade the unambiguous import of its plain text.

---

[14] Arguably, a third reason can be given in defense of the Pre-Negotiation Agreement's consideration. Under Rule 408, even statements made during a negotiation's course can be admitted "for another purpose, such as proving a witness's bias or prejudice." FED. R. EVID. 408(b); *Shaw Constructors v. PCS Nitrogen Fertilizer LP*, 326 F. App'x 860, 864 (5th Cir. 2009). Here, in light of the clarity of the Note, the Pre-Negotiation Agreement does not prove or disprove the validity or amount of a disputed claim. At best (or worst), it strengthens the case that the Note itself makes obvious: the Borrower and Guarantors are bound to pay it in full. It hence does not prove what the Note could not do, reinforcing rather than establishing. In addition, it could be contended that it serves to contradict and impeach the Irvin Defendants, a possibility that may also place it outside of Rule 408.

Accordingly, based on the foregoing, this Court GRANTS in part Plaintiff's motions for summary judgment by declaring that the Note binds the Irvin Defendants to pay any and all sums owed pursuant to its provisions, including principal, interest, and any penalties and fees.[15] For now, however, pending further discovery and review, it reserves any decision about the validity and enforceability of the underlying mortgage and the extent of the Irvin Defendants' non-financial obligations under the Note for a future date. So as to plot this case's future course and secure the just and speedy adjudication of this recently consolidated action, within fourteen (14) days of this opinion's docketing and by the end of business on the fourteenth day, Plaintiff and the Irvin Defendants must submit a joint statement outlining the remaining issues to be decided by this Court or at trial. This statement must not exceed five double-spaced pages. A telephonic status conference will be held on **Wednesday, November 18, 2015** at **9:30 AM**.  Counsel for Plaintiffs shall initiate the call and circulate the call in number to all parties and the Court prior to the conference call.

      Signed in Baton Rouge, Louisiana, on October 26, 2015.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[15] The Court thus finds no merit in the Irvin Defendants' contention that Plaintiff's latest calculation of their debt under the Note, (Doc. 75), by differing from its prior ones, (Doc. 52 at 2–3), raises an issue of material fact as to their duty to pay.