**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

**PNC BANK N.A.**

**versus**

**FIDELITY NATIONAL TITLE**
**INSURANCE COMPANY**

**NO. 13-578-JWD-RLB,**
**c/w 14-766-JWD-RLB, c/w 15-25-JWD-RLB**

**JUDGE deGRAVELLES**

**MAGISTRATE JUDGE BOURGEOIS**

**MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF**
**PETER S. TITLE**

**May It Please the Court:**

Defendant, Fidelity National Title Insurance Company, respectfully requests that this Court

grant its motion and exclude the testimony of PNC Bank, N.A.'s purported expert, Peter S. Title.

Mr. Title opines, without any support, that Fidelity was not reasonably diligent in its title curative

efforts because its curative counsel should have filed suit to cure title on the subject property within

**six months** of curative counsel being assigned to the claim.  But Mr. Title admits that this arbitrary

deadline is not based on any policy provision, industry guideline or standard, peer-reviewed

literature, generally accepted practice, or any methodology.  Mr. Title's standard-less opinion is not

supported, and therefore is unreliable and should be excluded.   Further, Mr. Title makes

impermissible legal conclusions regarding Fidelity's liability for consequential damages under the

relevant title insurance policy.  An expert may not testify regarding the law and thus this Court

should strike Mr. Title's opinions to the extent they contain legal conclusions.  Finally, Mr. Title is

not qualified to offer opinions regarding whether Fidelity's administration and adjustment of PNC's

claim was proper and timely as he lacks the "knowledge, skill, experience, training, or education"[1]

---

[1]  Fed. R. Evid. 702.

necessary to offer expert testimony on the subject.  Accordingly, this Court should grant Fidelity's

motion and exclude the inadmissible expert testimony of Mr. Title.

## I.      Background

The Irvin Family Limited Partnership ["Irvin Partnership"] obtained a loan for $2,550,000.00

from BMC Capital, LP on August 29, 2007 ["Loan"].[2]  The Irvin Partnership granted a mortgage

["Mortgage"] to BMC securing an interest in several parcels of property located in Gonzales,

Louisiana ["Property"] as collateral for the Loan.[3]  Lawyers Title Insurance Corporation issued a

title insurance policy on the Loan, Policy No. L20-000183 ["Policy"] to BMC.  BMC later assigned

its interest in the Loan and Mortgage to Red Mortgage Capital, which assigned its interest to PNC.[4]

After the Irvin Partnership defaulted on the Loan, PNC prepared to foreclose on the Property

but it discovered alleged defects in the title.[5]  In July 2011, PNC gave written notice of its title claim

to Fidelity.[6]  Fidelity immediately undertook to determine if PNC's claims were covered under the

Policy.  As part of its coverage investigation, Fidelity requested and received by letter dated October

12, 2011 additional information on the Property's claimed title defects from PNC's outside counsel,

Sam Bacot of the McGlinchey Stafford firm.[7]  Mr. Bacot also proposed what he believed to be

---

[2]  *See* PNC's Complaint [Rec. Doc. 1] ¶ 5.

[3]  *See id.* ¶ 6.

[4]  *See id.* ¶ 10.

[5]  *See id.* ¶ 11.

[6]  *See id.* ¶¶ 14-15.

[7]  *See* Exhibit A, Letter from Samuel A. Bacot, attorney for PNC, to Kathryn Turner, claims attorney for Fidelity, at 1-5 (Oct. 12, 2011).

effective "[c]orrective work."[8]

In November 2011, Fidelity accepted coverage for specified items and agreed to initiate curative efforts to resolve the title defects pursuant to the Policy. Fidelity retained the firm of Seale, Smith, Zuber & Barnette to represent PNC's interest to cure title to the Property. Additional title issues were discovered as curative efforts progressed — beyond six months — and Seale Smith continued to handle them as they arose. In a further effort to cure the title defects, the Seale Smith firm filed suit in this Court on behalf of PNC on December 10, 2014, No. 14-cv-00766-SDD-SCR [the "Title Action"]. On January 21, 2015, PNC also filed a suit against the Irvin Family Limited Partnership and other Irvin entities seeking recovery of the debt owed to PNC, No. 15-cv-00025-SDD-SCR [the "Default Action"]. This Court has granted a Motion for Summary Judgment in favor of PNC in the Default Action, finding that the Irvin Defendants owe the debt sued upon. PNC has obtained a judgment in excess of $3 million against the Irvin Defendants.

As this Court has seen, curative counsel have made extensive and regular efforts to cure title to the Property. As of the date of this filing, a total cure is imminent. Curative efforts have included obtaining releases of several encumbrances, obtaining acts of correction for property descriptions in the Mortgage, determining the owners of lots, obtaining conveyances from those owners to the borrower, and proposing to re-subdivide the Property into a single tract recognized by Ascension Parish.[9] PNC's own outside attorneys in the McGlinchey firm have continued to work with the

---

[8]  *Id.* at 6.

[9]  *See* Fidelity's Motion to Continue Trial [Rec. Doc. 30], Exhibit B, Fidelity's Responses to Interrogatories and Requests for Production, at 17-44, Response to Interrogatory No. 24; Exhibit C, Fidelity's Supplemental Responses to Interrogatories at 1-14, Supplemental Response to Interrogatory No. 24.

Seale Smith firm.[10]

Even though many issues had been cured, the complex nature of the title problems and the discovery of new items along the way (along with the death of the borrower's principal during curative efforts) prevented the immediate resolution of all issues.  Nevertheless, during the curative work, PNC filed its Complaint to initiate this Insurance Action against Fidelity on January 4, 2013 [the "Insurance Action"].  In its Complaint, PNC has alleged two causes of action against Fidelity: (1) breach of the Policy by the failure to diligently cure title; and (2) the breach of Fidelity's duty of good faith and fair dealing under the Louisiana Insurance Code.[11]

On April 24, 2014, Peter S. Title issued an expert report on behalf of PNC [the "Initial Report"] in the Insurance Action.[12]  In the Initial Report, Mr. Title opined that Fidelity failed to diligently correct the title defects.[13]  Mr. Title opined on the law, stating that Fidelity may be liable for consequential damages for not curing the title within a reasonable time after it received notice of the defects.[14]  According to Mr. Title,  Fidelity should have realized upon receipt of the notice of claim that the defects could not be cured within a reasonable time, given the extent of the title defects (despite Mr. Bacot's own assessment on behalf of PNC that the defects could be cured and despite the fact that he requested that they be cured), and should instead have paid PNC full policy limits for its loss.[15]  Mr. Title's Initial Report offers little else to support a finding that Fidelity did

---

[10]  *See id.*

[11]  *See* PNC's Complaint [Rec. Doc. 1] ¶¶ 29-41.

[12]  *See* Exhibit B, Initial Report of Peter S. Title (Apr. 24, 2014).

[13]  *See id.* at 2.

[14]  *See id.*

[15]  *See id.*

not act with diligence.

On November 29, 2016, Mr. Title issued a Supplemental Expert Report ["Supplemental Report"].[16]  In the Supplemental Report, Mr. Title again opined that "Fidelity did not undertake to cure the title defects in a reasonably diligent manner."[17]  He stated that once Fidelity became aware in December 2011 that the Irvin Partnership was in default of the loan and that PNC was unable to foreclose due to title issues, Fidelity should have expeditiously (i) identified the title problems, (ii) obtained a complete abstract of the property involved, (iii) obtained a new survey, (iv) identified what PNC needed from the Irvin Partnership to cure what was within the Irvin Partnership's control, (iv) identified third-party encumbrances, (v) drafted cure documents for the Irvin Partnership and third parties, and (vi) fixed a reasonable deadline to file a suit to quiet title.[18]  Mr. Title then established an unsupported, arbitrary deadline by which he believed Fidelity should have taken these steps:

> In my opinion, these tasks should have been completed by May 2012, or **within five (5) months** from the date that the file was assigned to counsel.  The proposed curative documents could and should have been presented to [the Irvin Partnership] five (5) months after the file was assigned, and [the Irvin Partnership] should have been given a deadline of **within thirty (30)** to [sic] **days** to executed and return the curative documents, or suit would be filed.  Thus, it is reasonable to assume that a suit to cure the title should have been filed **six (6) months** from the time that the file was assigned, or by July 2012.  It was unreasonable for Fidelity not to have filed a suit to cure title after six months had passed from its assignment of the claim to outside counsel at a time when PNC Bank remained unable to foreclose on its collateral.[19]

---

[16]  *See* Exhibit C, Supplemental Report of Peter S. Title (Nov. 29, 2016).

[17]  *See id.* at 6.

[18]  *Id.* at 4.

[19]  *Id.* at 4-5 (emphasis added).

Mr. Title was deposed on January 30, 2017.  Despite numerous opportunities, Mr. Title could

not cite any policy provision, industry standard, methodology, guideline, peer-reviewed literature,

or general acceptance to support his opinion that Fidelity should have filed a suit to cure title within

six months of the file being assigned:

Q:      Right, I want to find out what's diligent.  And I guess before we move on
        with this curative work, I'd like to talk about your five-month deadline in
        your supplemental report to present all curative documents to the borrower
        for its execution.  **There's no five-month deadline in the policy, is there**?

A:      **No**.

Q:      Okay.  And –

A:      I was – it seemed to be that's something that in a reasonable time frame could
        have been done within that period of time.  **There's no five month deadline
        in the policy**.

Q:      Okay.   And I guess that's what I want to get behind.   What's your
        methodology for arriving at a five-month deadline, because we're operating
        on a Daubert and Kuhmo tire [sic] here and whatever expert opinion you
        have needs to be escorted [supported] by some methodology.  **So what's
        your methodology at arriving at a five-month deadline**?

A:      When I use the word "deadline," I mean a reasonable time to identify – to get
        the abstract and get a survey and identify the issues involved, property that
        needs to be released from the mortgage, or the curative work that would need
        to be done.  I think that could – that's a reasonable time to, I think, looking
        at an abstract and getting the survey.  Five months is a reasonable time.

Q:      **But what's your methodology for arriving at five months being a
        reasonable time**?

A:      How much time it would take to review an – to get an abstract, to review it,
        to get a survey and to review it, and to identify the issues involved.  I think
        that would be the methodology just from a title examination standpoint.

Q:      How many abstracts?  We've already seen two or three.

A:      Well, the abstract – yeah, I mean, the one for – the one for – I think the one
        that I've seen for March 2012 is combined with everything except Lot 9.  So

6

I think that the one in March – the one that was done in February, I believe covered the property up to 2012, and then there was – I think they could have gotten one for Bonnie Lane earlier, I – I just think that's what a reasonable timeframe is for – for reviewing the abstract, looking at the survey, seeing what parties have interest and what needs to be terminated.

Q:     **Does this deadline come from some other writing that's been peer-reviewed?**

A:     **No.**  No, that's just what I think would be – most people would think would be a time period – a reasonable time to identify the problem.  So it's – you say "a deadline," it's not a deadline, it's just a reasonable time to – to act on the issues.

Q:     I'll call it a deadline just for shorthand.

A:     Right, okay.

Q:     When you say "most people," **is there some other source that shows that this five-month deadline is a generally accepted time period for a cure of this** nature?

A:     **I'm not aware of any**.

Q:     **Is it discussed in a journal or treatise**?

A:     **No**.[20]

* * *

Q:     Let's see, I forgot to ask you, you know, we were talking about the – your five-month deadline to – to prepare curative documents, and then you also had in your supplemental report a one-month deadline after the preparation of curative documents to wait for them to actually be signed, and that if they were not signed in that month, that a curative suit should have been filed.  Is that part of your opinion?

A:     Yes.

Q:     **So this one-month deadline, it's not in the policy, is it**?

---

[20] Exhibit D, Depo. of Peter S. Title, p. 142, *l*. 14 - p. 145, *l*. 6 (Jan. 30, 2017) (emphasis added).

A:     **No**.[21]

\*   \*   \*

Q:     That's the other thing, I just want to make sure –

A:     No, it's not statutory –

Q:     – **there's not a statute that applies directly to this situation**.

A:     **No, there isn't any.  There isn't any, and I'm not saying that there is**.[22]

\*   \*   \*

Q:     **Is this one-month time period anywhere in peer-reviewed literature**?

A:     **Not that I'm aware of**.  It's just a period of time that I would believe would be reasonable to send out – I mean, there's no time period, per se, to say 30 days.  This would be normal practice – when people send out documents, you know, get back to me in 30 days.  That's just a reasonable time for them to say yes, I'll do it, or I'm not going to do it.  Or it's not a – **it's not a deadline under the policy or anything like that**, it's just a reasonable time for people to respond to the documents.

Q:     Is this 30-day period anywhere – in any other source that shows it's a generally accepted time period for – between the time when curative documents are prepared and the time when the curative documents – excuse me, the time when a curative suit should be filed if they're not signed?[23]

\*   \*   \*

A:     It's a reasonable time to have experience to say, please look at them, review them, let us know if you have any issues, if you have any problems, sign them, don't sign them, let's talk.  If it's 60 days – I mean, I just think 30 days – if they're not going to respond in 30 days, that's just a reasonable time for someone to say yes, I'm going to work on this and cure it.

Q:     **I understand it's your personal view.  My question is** –

A:     **There's nothing in writing**.

---

[21]  *Id*. at p. 158, *l*.14 - p. 159, *l*. 2 (emphasis added).

[22]  *Id*. at p. 161, *ll*. 17-23 (emphasis added).

[23]  *Id*. at p. 162, *l*. 17 - p. 163, *l*. 11 (emphasis added).

Q:      – **whether there's any source that shows that a 30-day deadline between preparation of curative documents and the filing of a curative suit, if they're not executed, is a generally accepted deadline**.[24]

\*   \*   \*

A:      **I'm not aware of any particular law review articles or anything like that**. My putting it at 30 days was a reasonable time, my opinion to be a reasonable time, which obviously there's not – reasonable time is just an objective matter, and I think that's a reasonable time. **There's no rule that says 30 days to return curative documents, obviously, no statutes**. It's just a reasonable time that I think if the borrower was given the documents to respond to, that would be a reasonable time for them to respond.[25]

\*   \*   \*

Q:      All right. I want to go back kind of to the methodology behind your opinions, too. So it seems that you're saying, or at least that you're taking the position that all curative documents for all the issues involved in this case needed to have been drafted within five months of the assignment of the claim of curative counsel. As long as curative counsel – we've seen through these e-mails that there's at least some kind of steps being taken fairly regularly over these few months. As long as curative counsel is proceeding – and I'm going to ask you to make the assumption that it's with diligence so far – as long as curative counsel is proceeding with diligence on curative issues, if there are multiple issues, what is your methodology behind requiring all curative issues to be resolved within five months?[26]

\*   \*   \*

Q:      Excuse me, all curative documents to have been drafted within five months.[27]

\*   \*   \*

A:      The methodology is that would be – looking at the abstracts and the persons with interest involved, drafting the documents should – could have been accomplished within that timeframe period. Now, whether they get signed or not, I didn't say they would have to get approved and finalized, but they should have simply been presented. And these are the documents that we

---

[24] *Id*. at p. 163, *l*. 15 - p. 164, *l*. 8 (emphasis added).

[25] *Id*. at p. 164, *l*. 14 - p. 165, *l*. 1 (emphasis added).

[26] *Id*. at p. 197, *l*. 24 - p. 198, *l*. 17.

[27] *Id*. at p. 198, *ll*. 21-22.

feel need to be done to give borrowers title to the property.

Q:     **Is that methodology discussed in any journal or treatise anywhere**?

A:     **No, not that I'm aware of**.  It's a question of what is – what would be an attorney's time period, cure counsel's time period to prepare documents to send out, how much time would it take in a diligent manner which is, you know.

Q:     **Is there some source that says your view is the generally accepted view in the community**?

A:     **I'm not aware of the source that says five months is the generally accepted view**.  I think a reasonable time is – would be subsumed within that period of time.  Once you get all the documents – once you get the – once you get the title reviewed.[28]

Not only was Mr. Title asked this line of questions with regard to the initial handling of the claim, but he also testified that his arbitrary deadlines remained unchanged even when curative counsel found new title issues during curative efforts,[29] when PNC itself requested a different course of action for the cure,[30] when PNC's own counsel had not identified all title issues to give direction to curative counsel,[31] and when delays were caused by third parties with whom Fidelity was negotiating to cure title.[32]  With each scenario, Mr. Title was asked to show the methodology behind his opinion and to show any peer review or general acceptance of the opinion.  At every stage, Mr. Title could offer no methodology, peer-review, or general acceptance.

As demonstrated by the extensive testimony quoted above, Mr. Title's opinion that Fidelity

---

[28]  *Id*. at p. 198, *l*. 25 - p. 200, *l*. 2 (emphasis added).

[29]  *See id*. at p. 240, *l*. 17 - p. 242, *l*. 12.

[30]  *See id*. at p. 204, *l*. 5 - p. 207, *l*. 11 and p. 250, *l*. 12 - p. 253, *l*. 1.

[31]  *See id*. at p. 121, *l*. 15 - p. 123, *l*. 17; p. 128, *l*. - p. 129, *l*. 12; and p. 139, *l*. 1 - p. 141, *l*. 20,

[32]  *See id*. at p. 173, *l*. 22 - p. 179, *l*. 10 and p. 225, *l*. 18 - p. 226, *l*. 24.

should have filed a curative suit within six months is unreliable because it is not supported by any standard or guideline.  Further, Mr. Title's opinion in his Initial Report that Fidelity is liable to PNC under the Policy is an inadmissible legal conclusion that impedes on this Court's province. Accordingly, this Court should grant Fidelity's motion and exclude Mr. Title's unsupported, and therefore impermissible, testimony.

## II.     Law and Argument

### A.     The *Daubert* standard

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)     the testimony is based on sufficient facts or data;
>
> (c)     the testimony is the product of reliable principles and methods; and
>
> (d)     the expert has reliably applied the principles and methods to the facts of the case.[33]

In *Daubert v. Merrell Dow Pharmaceuticals*,[34] the United States Supreme Court held that Rule 702 requires the district court to acts as a gatekeeper to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable."[35]  In interpreting Rule 702, the Supreme Court, in *Daubert*, identified five factors that apply to evaluate expert testimony:

---

[33]  Fed. R. Evid. 702.

[34]  *See* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

[35]  *Id.* at 589, 113 S. Ct. at 2795.

whether the theory or technique in question can be (and has been) tested, whether it has been subjected to peer review and publication, its known or potential error rate and the existence and maintenance of standards controlling its operation, and whether it has attracted widespread acceptance within a relevant scientific community.[36]

In *Kuhmo Tire Co. v. Carmichael*,[37] the Supreme Court found that a court's "gatekeeping" function under *Daubert* applies to all forms of expert testimony, not just scientific testimony.[38] Sufficient facts to support an opinion and a reliable method are "in all instances mandatory."[39] The testimony must "assist the trier of fact to understand or determine a fact in issue."[40] The district court has the gatekeeping role to ensure that expert testimony is relevant and reliable.[41] The main focus of the *Daubert* analysis is "the scientific validity and thus the evidentiary relevance and reliability of the principles that underlie a proposed submission."[42] The court judges the principles and methodology the experts employ to reach their conclusions, not the conclusions themselves.[43] Consequently, a court should exclude an expert where, as here, the expert lacks a reliable methodology or sufficient facts to support his conclusion.[44]

   **B.      Mr. Title's opinion that Fidelity should have filed a suit to cure title within six**

---

[36]  *Id.* at 593-94, 113 S. Ct. at 2797.

[37]  *See* 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).

[38]  *Id.* at 147, 119 S. Ct. at 1174.

[39]  *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007).

[40]  *Daubert*, 509 U.S. at 592, 113 S. Ct. at 2796.

[41]  *Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513, 515 (5th Cir. 2013).

[42]  *Daubert*, 509 U.S. at 594-595, 113 S. Ct. at 2797.

[43]  *Id.* at 595, 113 S. Ct. at 2797.

[44]  *Matosky v. Manning*, 428 F. App'x 294, 298 (5th Cir. 2011).

**months of PNC's claim being assigned is unreliable and inadmissible.**

When expert testimony is challenged, the burden of proof lies with the party seeking to present the testimony.[45]   To meet its burden, the party "cannot simply rely on their expert's assurances that she has utilized generally accepted scientific methodology.  Rather, **some objective, independent validation of the expert's methodology is required**."[46]  Expert testimony "must be supported by appropriate validation — i.e., 'good grounds,' based on what is known.  In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability."[47]  "[C]onclusory opinions, which require blind acceptance of the expert's *ipse dixit*, are never helpful."[48]  Here, Mr. Title failed to offer any objective, independent validation for the methodology he supposedly relied on to conclude that Fidelity should have filed a curative suit within six months of the claim being assigned.  PNC cannot meet its burden to prove that Mr. Title's testimony is admissible, and thus this Court should exclude his improper expert testimony.

In *Wal-Mart Stores, Inc. v. Qore, Inc.*,[49] the Northern District of Mississippi held that an expert witness could not testify on whether or not remediation costs incurred by a retailer were

---

[45]  *Hebbler v. Turner*, No. 03-388, 2004 WL 414821, *3 (E.D. La. Mar. 3, 2004) (citing *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998)) (emphasis added).

[46]  *Id.*

[47]  *Daubert*, 509 U.S. 579, 590, 113 S. Ct. at 2795.

[48]  *Huang v. Marklyn Group Inc.*, No. 11-cv-01765-REB-BNB, 2014 WL 3559367, *5 (D. Colo. July 18, 2014); *see also Hatfield v. Wal-Mart Stores, Inc.*, 335 F. App'x 800 (10th Cir. 2009) (affirming exclusion of expert's testimony due to expert's failure to cite "any publication stating an industry standard"); *Graves v. Mazda Motor Corp.*, 405 F. App'x 296, 299-300 (10th Cir. 2010) (no error in excluding expert's testimony when his testimony was based on "no more than his say so"); *Murray v. Marina Dist. Dev. Co.*, 311 F. App'x 521, 524 (3rd Cir. 2008) (no error in excluding "industry expert" testimony that "fail[ed] to identify the source of any industry standards").

[49]  No. 1:06CV326, 2009 WL 279096 (N.D. Miss. Feb. 5, 2009).

reasonable and necessary because the expert failed to reveal the methodology he used and failed to

make mention of any industry standards in his testimony.  In *Qore*, the defendants designated the

expert to testify as to whether remediation costs incurred by Wal-Mart were reasonable and

necessary.[50]  The court found that the expert's experience and education clearly allowed him to

opine on construction costs and that he was qualified to testify, based on that education and

experience, on incorrect billing and overbilling.[51]  Although the expert indicated in his report that

he relied on his experience and industry standards to arrive at his conclusions, the court found that

the expert failed to relate the nexus between his experience and conclusions.[52]  Also fatal to the

expert's testimony was his failure, despite multiple opportunities, to disclose industry standards on

which he relied in forming his opinions:

> More concerning is Majors failure to make mention of any industry standards during
> his testimony.  Not once does Majors give the court the standard he applied.
> ***Daubert's* gatekeeping function is specifically designed to keep standardless
> testimony out of evidence**.[53]

The court continued:

> Majors opines on a variety of subjects, but he offers no guide as to where his
> conclusions came from or how one might judge the value of those conclusions.
> Operating in a standardless world allows Majors to get on the stand and make any
> assertion he chooses without regard for the truth.  There is no way to judge those
> who operate without bounds.  It is unfair to put a jury in the position of having to
> try.[54]

---

[50]  *See id.* at *1.

[51]  *See id.*

[52]  *See id.*

[53]  *Id.* (emphasis added).

[54]  *Id.*

Accordingly, because the purported expert failed to come forward with any industry standard to support his opinion, the court granted the motion *in limine* to exclude the defendant's expert's testimony.[55]

In *Hebbler v. Turner*,[56] the Eastern District of Louisiana struck the testimony of a real estate agent who was offered as an expert to testify regarding the plaintiffs' claim that the defendant breached a fiduciary duty to a law firm and its shareholders by overcharging rent for the use of a building owned by the defendant.  The court found that the expert's opinion failed to meet the defendant's burden under *Daubert* and was inadmissible in part because she gave "no indication of the method she used to appraise the relevant commercial real estate, other than to say she relied on her knowledge, company listings, and other materials. . . . In short, defendants have supplied the Court with little more than their proposed expert's *curriculum vitae*, her opinion testimony, and the promise that she relied on unprovided, non-referenced, comparable materials in reaching her conclusions.  Focusing, 'solely on [Huseman's] principles and methodology, not on the conclusions that they generate,' this Court is unable to find that defendants have met their burden under *Daubert* and *Moore v. Ashland Chemical*."[57]

Similarly, Mr. Title's opinion that Fidelity should have presented curative documents to the Irvin Partnership five months after the file was assigned, with a thirty-day deadline for the Irvinship Partnership to execute the documents or suit would be filed, regardless of developing circumstances in the case, is unsupported and unreliable.  Mr. Title's deposition testimony makes clear that he did

---

[55]  *See id.*

[56]  No. 03-388, 2004 WL 414821.

[57]  *Id.* at *4.

not rely on any industry standard or guideline in concocting his six-month deadline by which he believed Fidelity should have filed a curative suit. Mr. Title's deposition testimony is replete with his admission that there is no policy provision, rule, industry standard, generally accepted guideline, written authority, peer-review, or other reliable source to support his opinion.

As recognized by the court in *Qore*, the very purpose of the court's gatekeeping function under *Daubert* is to "keep standardless testimony out of evidence."[58]  This Court should not allow Mr. Title to "[operate] in a standarless world" and "get on the stand and make any assertion he chooses without regard for the truth."[59]  Because Mr. Title's opinion is not based on any industry standard or guideline, his opinion is unreliable and this Court should exclude any testimony by Mr. Title that Fidelity was not diligent because it did not file suit within six months of the file being assigned.

### C.    To the extent Mr. Title's opinions contain legal conclusions, those opinions are improper and should be excluded.

While an expert may testify regarding how certain terms in a   policy are commonly interpreted in the title insurance industry, he may not testify regarding legal conclusions pertaining to contract interpretation and breach.  Although an expert may "offer an opinion that 'embraces an ultimate issue,' the Fifth Circuit Court of Appeals has cautioned that [Rule 704] 'does not open the

[58]  *Qore*, 2009 WL 279096, *2.

[59]  *Id.*

door to all opinions.'"[60]   An expert's legal conclusion is not admissible because it "invades the court's province and is irrelevant."[61]   Thus "an expert may never render conclusions of law" and may not "go beyond the scope of his expertise in giving his opinions."[62]

In *Versai Management Corp. v. Landmark American Ins. Corp.*,[63] the defendant moved to exclude the plaintiff's expert's testimony to the extent the expert made the following legal conclusions: (1) the Louisiana Valued Property Law, under Louisiana Revised Statute § 1318, ("VPL") applied to the relevant insurance policy; (2) an endorsement in the policy was ambiguous; and (3) the defendant acted in bad faith in adjusting plaintiff's losses.[64]   The court excluded the expert's opinion that the VPL applied to the policy because whether the policy was a valued policy within the meaning of the statute was a question of law for the court.[65]   The court also excluded the expert's opinion that the policy endorsement was ambiguous as that too was a legal conclusion.[66]   Finally, the expert's opinion that the defendant acted in bad faith was similarly excluded, but the court held that the expert could testify regarding industry standards for claims adjustment as such testimony would be helpful for the jury.[67]

Here, Mr. Title, in his Initial Report, improperly opined that, based on law from another

---

[60]   *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983).

[61]   *Id.*

[62]   *Id.*

[63]   Nos. 11-290, 22-2139, 11-2140, 2013 WL 681902, *3 (E.D. La. Feb. 22, 2013).

[64]   *See id.* at *1.

[65]   *See id.* at *2.

[66]   *See id.* at *3.

[67]   *See id.*

jurisdiction, Fidelity may be liable to PNC for consequential damages.[68]   Mr. Title even cited

particular case law that allegedly supported his opinion.[69]   Mr. Title's opinion that Fidelity may be

liable for consequential damages based on case law is inadmissible because it is an improper legal

conclusion that impedes on this Court's province, and thus should be excluded.

     **D.**       **Mr. Title is not qualified to offer an opinion related to Fidelity's adjustment of PNC's claim**.

Mr. Title is not qualified to offer an opinion on whether Fidelity acted in a reasonably

diligent manner in adjusting PNC's claim.  A court must be assured that a proffered expert witness

is qualified to testify by virtue of his "knowledge, skill, experience, training, or education."[70]   "A

district court should refuse to allow an expert witness to testify if it finds that the witness is not

qualified to testify in a particular field or on a given subject."[71]

Mr. Title has offered opinions that bear upon Fidelity's adjustment of PNC's claim.  For

instance, Mr. Title opined generally that Fidelity did not act in a reasonably diligent manner in

attempting to remove the title defects.[72]   Mr. Title further opined on the alleged "paucity of time for

---

[68]  Ex. B, Initial Report at 2.

[69]  *See id*., wherein Mr. Title cites *Premier Tierra Holdings, Inc. v. Ticor Title Ins. Co, of Florida, Inc*., No. 4:09-CV-02872, 2011 WL 2313206 (S.D. Tex. June 9, 2011) and *First Am. Title Ins. Co. v. Columbia Harrison LLC*, No. 3:12-cv-00800-JFA, 2013 WL 1501702 (D. S.C. 2013) to opine that Fidelity may be liable to PNC for consequential damages.  As stated in Fidelity's Reply in Support of Motion for Summary Judgment [Rec. Doc. 246], those cases are not the law in Louisiana or the Fifth Circuit, and they also do not apply to support PNC's full claims in the case and thus Fidelity cannot be liable to PNC for consequential damages.

[70]  Fed. R. Evid. 702.

[71]  *Wilson v. Woods*, 163 F. 3d 935, 937 (5th Cir. 1999).

[72]  *See* Ex. C, Supplemental Report at 2.

cure efforts"[73] and Fidelity's alleged minimal involvement in the monitoring and supervision to cure title.[74]

But Mr. Title is not qualified to testify regarding title insurance claims administration or adjustment.  Mr. Title has never been qualified to testify as an expert in the custom and practice of claims administration of title insurance claims.[75]  He has never worked as a claims attorney for a title insurer.[76]  He has never worked as a claims adjuster or claims administrator for a title insurer.[77] Indeed, he has never worked as a direct employee in any capacity for a title insurer.[78]  Mr. Title's lack of "knowledge, skill, experience, training, or education"[79] in the area of claims adjustment renders him unqualified to testify to Fidelity's administration of PNC's claim.  Thus Mr. Title's opinions related to Fidelity's handling of PNC's claim are inadmissible and should be excluded.

## III.    Conclusion

For the foregoing reasons, this Court should grant Fidelity's motion and exclude the unsupported, and therefore inadmissible, testimony of PNC's expert, Mr. Title.


Respectfully submitted,

/s/ John T. Balhoff, II

---

[73] *Id*. at 7.

[74] *See id*. at 7.

[75] *See* Exhibit D, Depo. of Peter S. Title, p. 19, *ll*. 2-5.

[76] *See id*. at p. 19, *ll*. 6-10.

[77] *See id*. at p. 19, *ll*. 11-13.

[78] *See id*. at p. 19, *ll*. 14-16.

[79] Fed. R. Evid. 702.

JAMES M. GARNER # 19589
ELWOOD F. CAHILL, JR. # 3764
JOHN T. BALHOFF, II # 24288
EMILY E. ROSS # 34739
**SHER GARNER CAHILL RICHTER KLEIN &**
  **HILBERT, L.L.C.**
909 Poydras Street, Twenty-eighth Floor
New Orleans, Louisiana  70112
Telephone: (504) 299-2100
Facsimile: (504) 299-2300
**ATTORNEYS FOR FIDELITY NATIONAL**
**TITLE INSURANCE COMPANY**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 24, 2017, a copy of the above and foregoing has been filed electronically with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ John T. Balhoff, II

JOHN T. BALHOFF, II

20